the basis of a finding that Angel's inappropriate discipline of Cassandra placed both children at risk of harm. There is some indication in the record that this discipline was intended as punishment for Cassandra's "back-talking and not doing her homework." Following adjudication, there was a subsequent incident of inappropriate discipline directed at Moira which prompted the juvenile court to specifically order that Angel "shall not lock Moira . . . in her room at any time." Given the court's finding that Angel had made "minimal progress . . . to alleviate the causes of the Court's adjudication," to which no exception was taken on appeal, and the recommendation of DHHS against homeschooling, the juvenile court was entirely justified in concluding that Moira's best interests would not be served by an educational setting which would place her under Angel's exclusive control with no opportunity for regular interaction with other adults interested in her welfare. The court's prohibition of homeschooling was directly related to the parental conduct which resulted in adjudication, and the court properly exercised its discretion to prohibit homeschooling as a part of a rehabilitation program to address such conduct.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the separate juvenile court.

AFFIRMED.

————————————

UNLIMITED OPPORTUNITY, INC., DOING BUSINESS AS
JANI-KING OF OMAHA, APPELLANT, V. ANTHONY
WAADAH, AN INDIVIDUAL, DOING BUSINESS AS
LEGBO SERVICES, ET AL., APPELLEES.

___ N.W.2d ___

Filed April 10, 2015.    No. S-14-012.

1. **Contracts: Appeal and Error.** The interpretation of a contract involves a question of law, in connection with which an appellate court has an obligation to reach its conclusions independent of the determinations made by the court below.

2. **Restrictive Covenants: Courts: Reformation.** It is not the function of the courts to reform a covenant not to compete in order to make it enforceable.

3. **Restrictive Covenants: Employer and Employee.** A partial restraint of trade such as a covenant not to compete must meet three general requirements to be valid. First, the restriction must be reasonable in the sense that it is not injurious to the public. Second, the restriction must be reasonable in the sense that it is no greater than reasonably necessary to protect the employer in some legitimate business interest. Third, the restriction must be reasonable in the sense that it is not unduly harsh and oppressive on the party against whom it is asserted.

4. **Restrictive Covenants: Sales.** A covenant not to compete ancillary to the sale of a business must be reasonable in both space and time so that it will be no greater than necessary to achieve its legitimate purpose. Whether such a covenant not to compete is reasonable with respect to its duration and scope is dependent upon the facts of each particular case.

Appeal from the District Court for Douglas County: W. Russell Bowie III, Judge. Affirmed.

Edward F. Pohren, of Smith, Gardner, Slusky, Lazer, Pohren & Rogers, L.L.P., for appellant.

Philip J. Kosloske and Ryan M. Hoffman, of Anderson, Bressman & Hoffman, P.C., L.L.O., for appellees.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Heavican, C.J.

# I. INTRODUCTION

In 2008, appellant Unlimited Opportunity, Inc., doing business as Jani-King of Omaha (Jani-King), granted appellee Anthony Waadah a franchise in the Omaha, Nebraska, area. The franchise agreement was ultimately broken, and Waadah diverted a number of Jani-King's Omaha customers to his new business. Jani-King filed suit against Waadah for breach of the noncompete clause in the franchise agreement.

The district court found the noncompete clause included an unreasonable restraint on competition and refused to sever the offending subpart from the larger noncompete clause. Jani-King asks us to reconsider our law against severability as generally set out in *H & R Block Tax Servs. v. Circle A*

*Enters*.[1] and *CAE Vanguard, Inc. v. Newman*.[2] We reaffirm our stance against severability of noncompete clauses and affirm the judgment of the district court.

## II. BACKGROUND

The parties have stipulated to the following facts as summarized below:

Jani-King is a franchisor of professional cleaning and maintenance services. Its franchisees belong to a "franchise system" under the control of Jani-King. Jani-King provides to its franchisees its trade name, name recognition, goodwill, and reputation.

Under Jani-King's franchise model, Jani-King identifies, markets to, solicits, and negotiates with customers in a given operations area. Jani-King secures each client contract and then turns the client over to the franchisee. The franchisee provides the contracted-for janitorial services.

The parties have further stipulated that the noncompetition covenant in the agreement protected "the reputation and goodwill associated with the franchise's trademarks," Jani-King's "overall investment in its franchise system," and the "proprietary information and knowledge [Jani-King] disclosed to franchisees" through the course of the franchise relationship. The parties also stipulated that the "intended purpose" of the noncompetition agreements for the franchise was the "protection of the integrity of the overall franchise system [and] protection of current franchisees in the Jani-King system."

The section of the franchise agreement containing the disputed noncompete clause states in pertinent part:

> Franchisee . . . agrees that, during the term of this Agreement and for a continuous uninterrupted period of (2) years thereafter . . . commencing upon expiration or termination of this Agreement, . . . Franchisee . . . shall not . . . :
>
>     . . . .

---

[1] *H & R Block Tax Servs. v. Circle A Enters.*, 269 Neb. 411, 693 N.W.2d 548 (2005).

[2] *CAE Vanguard, Inc. v. Newman*, 246 Neb. 334, 518 N.W.2d 652 (1994).

*(d) Own, maintain, operate, engage in or have any interest in any business (hereinafter referred to as "Competing Business") which is the same as or similar to the business franchised under the terms of this Agreement, which Competing Business operates, solicits business, or is intended to operate or solicit business: (i) within the Territory of this Agreement; and (ii) for a period of one (1) year commencing upon expiration or termination of this Agreement (regardless of the cause for termination), in any other territory in which a Jani-King franchise operates.*

(Emphasis supplied.) This clause prohibited a franchisee from operating for 2 years the same or a similar business within the territory of the agreement. It also prohibited a franchisee from operating for a period of 1 year a competing business in any other territory in which a Jani-King franchise operates. The clause was set to run upon expiration or termination of the agreement.

Waadah was a franchisee of Jani-King. In 2010, Jani-King began receiving reports from its customers that Waadah was attempting to divert Jani-King customers for his own janitorial business. Notably, in January 2010, a dairy company terminated its relationship with Jani-King and immediately began receiving janitorial services from Waadah. Jani-King claims this constituted a breach of the Jani-King franchise contract, and Jani-King terminated its relationship with Waadah.

In the approximately 18 months following this contract termination, Waadah formed Legbo Services of Omaha (Legbo). Legbo began providing janitorial services to several of Jani-King's client accounts. Legbo also secured janitorial contracts with new clients in the Omaha area. The parties stipulated that had the franchise agreement been followed, these new contracts would have belonged to Jani-King.

Jani-King sued Waadah; his wife; and Legbo Group, LLC, a corporation run by his wife, seeking to enforce and receive damages from the breach of the franchise agreement. For ease of reading, in the remainder of the opinion, we generally speak of the defendants as Waadah. In the district court,

Jani-King alleged that the 2-year noncompete clause had been breached.

After a bench trial, the district court issued a ruling for Waadah. In so finding, the court relied on *H & R Block Tax Servs*. and held that it was unreasonable to restrict competition outside of the area in which Waadah actually conducted business.[3] Since the 1-year restraint restricted commencement of a competing business "in any other territory in which a Jani-King franchise operates," and since Jani-King operated in countries throughout the world, this restraint was deemed unreasonable in geographic scope. The court found it need not address the remaining parts of the noncompete clause, because "'it is not the function of the courts to reform a covenant not to compete in order to make it enforceable.'"

The court also dismissed a tortious interference claim, concluding that competitors fall under a privilege to interfere in business relationships. Because the court found the covenant not to compete legally unenforceable, Waadah was found to be a competitor to Jani-King and was immune from a claim of tortious interference.

Jani-King appealed and petitioned this court for a bypass of the Nebraska Court of Appeals. We granted that motion.

## III. ASSIGNMENTS OF ERROR

Jani-King (1) "seeks a reexamination of the Nebraska public policy as it pertains to non-competition covenants in franchise agreement[s], to overrule those parts" of *H & R Block Tax Servs*.[4] that "bar 'severability' of integrated restraints of trade in franchise agreements and that do not permit courts to 'reform' the scope or duration of covenants against competition within a franchise agreement"; (2) assigns, restated, as error the district court's analysis of the 1-year restraint because (a) no evidence as to that restraint was presented, (b) Jani-King did not seek enforcement of that restraint, and (c) the 1-year restraint was moot by the passage of time;

---

[3] *H & R Block Tax Servs*., *supra* note 1.

[4] *Id*.

and (3) assigns, restated, as error the finding that the non-compete clause was unreasonable and, thus, the finding that the breach of contract and tortious interference claims must be dismissed.

## IV. STANDARD OF REVIEW

[1] The interpretation of a contract involves a question of law, in connection with which an appellate court has an obligation to reach its conclusions independent of the determinations made by the court below.[5]

## V. ANALYSIS

This case presents two distinct issues: first, whether the 1-year noncompetition covenant was severable from the 2-year covenant, and if not, second, whether the entirety of the noncompetition agreement is valid and enforceable.

### 1. Severability

[2] We turn first to severability. This court has long held that it is not the function of the courts to reform a covenant not to compete in order to make it enforceable.[6] We have declined to apply the "'blue pencil' rule," which allows for the reformation of covenants to make them enforceable, stating that "we must either enforce [a covenant] as written or not enforce it at all."[7] We have found that "reformation is tantamount to the construction of a private agreement and that the construction of private agreements is not within the power of the courts."[8]

Though this position against the severability of noncompete covenants is the minority one, it is backed by important public policy considerations. Severability of noncompete covenants is against public policy because it creates uncertainty in employees' contractual relationships with franchisors, increases the

---

[5] *Id.*

[6] See *CAE Vanguard, Inc., supra* note 2. See, also, *Gaver v. Schneider's O.K. Tire Co.*, 289 Neb. 491, 856 N.W.2d 121 (2014).

[7] *CAE Vanguard, Inc., supra* note 2, 246 Neb. at 338, 339, 518 N.W.2d at 655, 656.

[8] *Id.* at 339, 518 N.W.2d at 655.

potential for confusion by parties to a contract, and encourages litigation of noncompete clauses in contracts.[9]

In *H & R Block Tax Servs.*, we affirmed our rejection of the blue pencil rule.[10] There, a noncompete clause restrained franchisees from competing in the business of preparing tax returns within 45 miles of the franchise territory for 1 year following termination of the franchise contract. One of the defendants had done tax planning for the franchisor in Ogallala, Nebraska, and later moved to North Platte, Nebraska, where she began an independent tax return preparation business. Some of her former clients from the franchisor's similar business wished to retain her services after she moved. The former clients pursued and enlisted her services in North Platte.[11] In that case, we found that separate paragraphs of a covenant not to compete were not severable, so that if any portion of the covenant was invalid and unenforceable, the remainder of it was unenforceable as well.[12]

In this case, the district court found that the 1-year provision restricting competition anywhere a Jani-King franchise operates was unenforceable and did not further consider Jani-King's claim with respect to the 2-year covenant. In its first assignment of error, Jani-King argues that this was error, asking that we reexamine Nebraska law barring severability of integrated restraints of trade and that we instead permit courts to reform or modify the scope or duration of covenants against competition, particularly within the context of franchise agreements. Jani-King further asserts that Nebraska's Franchise Practices Act (Act)[13] should guide our decision and that *H & R Block Tax Servs.*, as well as other Nebraska case law rejecting the blue pencil rule, is contrary to the Act.[14]

---

[9] Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672 (2008).

[10] *H & R Block Tax Servs., supra* note 1.

[11] *Id.*

[12] *Id.*

[13] Neb. Rev. Stat. §§ 87-401 through 87-410 (Reissue 2014).

[14] Brief for appellant at 19.

We decline Jani-King's invitation to reconsider our rejection of the blue pencil rule. As explained above, public policy considerations dictate our conclusion that such agreements should not be severable.

We also disagree that the Act is contrary to our case law. The section of the Act declaring its "Legislative intent" states:

The Legislature . . . declares that distribution and sales through franchise arrangements in the state vitally affect the general economy of the state, the public interest and public welfare. It is therefor necessary in the public interest to define the relationship and responsibilities of franchisors and franchisees in connection with franchise arrangements.[15]

While the Act defines the relationship and responsibilities between franchisors and franchisees, it does not reference noncompete covenants in franchise agreements.

Nor is the Act contrary to the severability holdings of *H & R Block Tax Servs*. and *CAE Vanguard, Inc*.[16] Essentially, the Act attempts to stabilize relationships between franchisors and franchisees by providing guidelines on what is and what is not acceptable in the context of a franchise agreement. For example, the sections of this Act state that it is a violation for a franchisor to terminate a franchise without good cause, to restrict the sale of securities or stock to employees or other personnel of the franchise, to impose unreasonable standards of performance upon a franchisee, or to prohibit the right of free association among franchisees for any lawful purpose.[17] However, the Act does not discuss noncompete covenants in a franchise agreement. We decline to conclude that the Act dictates public policy for the severability of franchise agreements.

For these reasons, we conclude that the 1-year covenant not to compete is not severable from the 2-year covenant.

[15] § 87-401.

[16] See, *H & R Block Tax Servs*., *supra* note 1; *CAE Vanguard, Inc*., *supra* note 2.

[17] § 87-406(3), (4), and (5).

The district court was correct to consider the two covenants together and find the entire clause invalid if one portion is invalid.

## 2. Enforceability

We next turn to whether the district court erred in finding the noncompete agreement unenforceable as Jani-King contends in its second and third assignments of error.

### (a) Nature of Transaction

Whether a noncompete clause is valid and enforceable requires us to categorize the covenant as either an employment contract or the sale of goodwill.

[3] Regardless of the context, a partial restraint of trade such as a covenant not to compete must meet three general requirements to be valid.[18] First, the restriction must be reasonable in the sense that it is not injurious to the public.[19] Second, the restriction must be reasonable in the sense that it is no greater than reasonably necessary to protect the employer in some legitimate business interest.[20] Third, the restriction must be reasonable in the sense that it is not unduly harsh and oppressive on the party against whom it is asserted.[21]

[4] Nebraska courts are generally more willing to uphold promises to refrain from competition made in the context of the sale of goodwill as a business asset than those made in connection with contracts of employment,[22] reasoning that in the sale of a business, "[i]t is almost intolerable that a person should be permitted to obtain money from another upon solemn agreement not to compete for a reasonable period within a restricted area, and then use the funds thus obtained to do

---

[18] *H & R Block Tax Servs.*, *supra* note 1.

[19] *Id*. See, also, *Polly v. Ray D. Hilderman & Co.*, 225 Neb. 662, 407 N.W.2d 751 (1987).

[20] *H & R Block Tax Servs.*, *supra* note 1.

[21] *Id*.

[22] *Id*.; *Presto-X-Company v. Beller*, 253 Neb. 55, 62, 568 N.W.2d 235, 239 (1977).

the very thing the contract prohibits."[23] Thus, a covenant not to compete ancillary to the sale of a business must be reasonable in both space and time so that it will be no greater than necessary to achieve its legitimate purpose. Whether such a covenant not to compete is reasonable with respect to its duration and scope is dependent upon the facts of each particular case.[24]

In *H & R Block Tax Servs.*, the franchisor provided various goods and services to its franchisees, including training, advertising, and forms.[25] It retained significant control over its franchisees, but the "main purpose of obtaining a franchise from [the franchisor was] to trade on the reputation and goodwill of its service mark and thereby acquire customers."[26] There, we found that the franchise agreement was analogous to the sale of a business for purposes of determining enforceability of the covenant not to compete.[27] We then applied the analysis outlined for the sale of goodwill of a business asset to determine whether the noncompete clause was valid.[28]

We conclude that the characterization of the noncompete agreement contained in a franchise agreement used in *H & R Block Tax Servs.* is the correct one, and we apply the standard used in the sale of goodwill.

### (b) Reasonableness of Restriction

We turn next to whether the noncompete agreement in this case was reasonable in its restriction of competition. There is no allegation that the restriction is injurious to the public. We therefore focus our analysis on whether the covenant was reasonable in both space and time such that the restraint imposed

---

[23] *Swingle & Co. v. Reynolds*, 140 Neb. 693, 695, 1 N.W.2d 307, 309 (1941).

[24] See, *H & R Block Tax Servs., supra* note 1; *Presto-X-Company, supra* note 22.

[25] *H & R Block Tax Servs., supra* note 1.

[26] *Id.* at 421, 693 N.W.2d at 556.

[27] *H & R Block Tax Servs., supra* note 1.

[28] *Id.*

will be no greater than necessary to achieve its legitimate purpose.[29] We conclude that it is not.

In order for something to be reasonable in both space and time, it must usually have a territorial restriction.[30] For example, a covenant restricting a prospective rent-a-car franchisee from operating in competition anywhere in the western hemisphere for a period of 2 years has been held unreasonable as being a restraint of trade.[31] Similarly held unreasonable was the covenant of a franchisee of a tax preparation firm, which covenant did not expressly have any territorial restriction placed upon it.[32]

In *H & R Block Tax Servs.*, the noncompete clause restrained its franchisees from competing in the business of preparing tax returns within 45 miles of the franchise territory for 1 year following termination of the franchise contract.[33] There, we found that such a restriction was reasonable in time and geographic scope because it only prohibited competition for one tax season.

Jani-King's 1-year covenant is quite different from the restriction in *H & R Block Tax Servs.* Jani-King's 1-year restraint prohibited the franchisee from operating a "Competing Business" "in any other territory in which a Jani-King franchise operates." Since Jani-King operates on a multi-state and international basis, on continents as far away as Australia, the restriction from competing in "any . . . territory in which a Jani-King franchise operates" is similar to having no territorial restriction at all. We find that this is unreasonable in geographic scope. And because this 1-year restraint is not severable from the 2-year restraint also presented by this covenant, the entire noncompete agreement is unenforceable.

---

[29] *Id.*

[30] See, e.g., *Budget Rent-A-Car Corporation of America v. Fein*, 342 F.2d 509 (1965); *H & R Block, Inc. v. Lovelace*, 208 Kan. 538, 493 P.2d 205 (1972).

[31] *Budget Rent-A-Car Corporation of America*, supra note 30.

[32] *H & R Block, Inc.*, supra note 30.

[33] *H & R Block Tax Servs.*, supra note 1.

Because we find that the noncompete covenant is invalid and unenforceable, we affirm the dismissal of Jani-King's breach of contract and tortious interference claims.

## VI. CONCLUSION

We affirm the district court's decision.

Affirmed.

————————————

Shasta Linen Supply, Inc., appellee, v.
Applied Underwriters, Inc., and Applied
Underwriters Captive Risk Assurance
Company, Inc., appellants.

___ N.W.2d ___

Filed April 10, 2015.    No. S-14-270.

1. **Judgments: Jurisdiction.** A jurisdictional question that does not involve a factual dispute presents a question of law.
2. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction.
3. **Jurisdiction: Final Orders: Appeal and Error.** An appellate court has the power to determine whether it has jurisdiction over an appeal and to correct jurisdictional issues, even though a party's failure to appeal from a final order precludes an appellate court from exercising jurisdiction over the matters decided in the order.
4. ____: ____: ____. An appellate court lacks jurisdiction to entertain an appeal unless it is from a final order or a judgment.
5. ____: ____: ____. The first step in determining the existence of appellate jurisdiction is to determine whether the lower court's order was final and appealable.
6. **Final Orders: Appeal and Error.** Under Neb. Rev. Stat. § 25-1902 (Reissue 2008), an appellate court may review three types of final orders: (1) an order affecting a substantial right in an action that, in effect, determines the action and prevents a judgment; (2) an order affecting a substantial right made during a special proceeding; and (3) an order affecting a substantial right made on summary application in an action after a judgment is rendered.
7. **Injunction: Final Orders: Appeal and Error.** A temporary injunction is not a final, appealable order.
8. **Arbitration and Award.** A motion to compel arbitration invokes a special proceeding.
9. **Injunction: Final Orders: Appeal and Error.** A court's temporary injunction or stay that merely preserves the status quo pending a further order is not an order